# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KELLY CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 11-cv-360 |
| | ) | |
| THOMPSON HOTELS d/b/a | ) | Judge Joan H. Lefkow |
| SAX CHICAGO | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Kelly Carter filed this lawsuit against Thompson Hotels ("the hotel") alleging race

discrimination and retaliation while employed at Thompson's SAX Chicago location, in

violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e

*et seq.*[1] Presently before the court is the hotel's motion for summary judgment on plaintiff's

amended complaint.[2] For the reasons that follow, the hotel's motion for summary judgment is

granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56

(a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings

---

[1] Carter voluntarily dismissed his claims alleging a hostile work environment and failure to promote. *See* Dkt. 40.

[2] The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3). Venue is proper in this district under 28 U.S.C. § 1391(b). Carter exhausted his administrative remedies and timely filed his Title VII claims within 90 days of receiving a notice of right to sue. *See* 42 U.S.C. § 2000e-5(f)(1); *Conner* v. *Ill. Dep't of Nat'l Res.*, 413 F.3d 675, 680 (7th Cir. 2005).

and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee notes (1963 amend.) While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## BACKGROUND[3]

### I.    Carter's Employment Duties at the Hotel

Carter, who is African-American, began working for the hotel's predecessor as an engineer in 1999. The events at issue occurred during the summer and fall of 2010.[4] During this period, the hotel employed six full-time engineers, of whom Carter was the most senior. The engineers' job duties included performing maintenance and repairs within the hotel. Engineers performed many of the same duties although their individual areas of skill and experience differed. Carter's skill was in heating, ventilation, and air conditioning (HVAC). In addition, Carter worked on kitchen equipment and ice machines. All hotel employees were subject to an employee handbook, which Carter acknowledged receiving and understanding. Julie Vasic, the hotel's director of human resources, had authority to discipline employees for rule violations

---

[3] The facts in the background section are taken from the parties' Local Rule 56.1 statement of facts and construed in the light most favorable to Carter. The parties largely dispute the events giving rise to the allegations in the case. At this stage, the court credits Carter's version of events because he is the nonmovant. *See Gawley* v. *Ind. Univ.*, 276 F.3d 301, 305 (7th Cir. 2001). Still, the court does not credit those statements that are inconsistent with the record or which are based upon evidence that does not support a denial.

[4] All events occurred in 2010 unless otherwise stated.

2

enumerated in the employee handbook. Vasic consulted as she deemed appropriate with Michael Carsch, the hotel's general manager, when deciding whether to discipline employees. Ray Kemph, the hotel's chief engineer, could recommend that an employee receive discipline. Kemph provided the engineers with a job description, a guide on proper guest room entry procedures, a guide on proper preventive maintenance procedures, and a guide on lunch period relief for the house call engineer. The hotel applied "progressive discipline," starting at counseling, proceeding to verbal warning, written warning, final written warning, and termination. Warnings were classified as related either to performance or behavior.

## II.     Carter's Work Performance History

In March, Carter received a performance review from Vasic and Bruce Hermann, the chief engineer preceding Kemph. The review stated that Carter's job performance needed improvement in the areas of (1) job knowledge; (2) quantity of work performed; (3) quality of work performed; (4) interpersonal skills; (5) attendance/punctuality; and (6) adherence to standards and policies. Def. L.R. 56.1 ¶ 11. The review explained, "[Carter]'s quality of work is below average. [Carter] needs to be reminded frequently to do things that are part of his job. He needs to produce more work output during his shifts. He needs to be more cognizant of the systems that he is responsible for checking and maintaining on a regular basis."

### III.    Carter's Discipline in August 2010 through November 2010

#### A.    Attendance Issues

The hotel's attendance policy required employees to give at least three hours notice of absence or tardiness and warned that "unexplained or excessive absenteeism or tardiness can lead to disciplinary action or dismissal."  Pl. L.R. 56.1 ¶ 12.[5]  On July 25, August 11 and August 12, Carter was absent; he arrived late for work on August 4 and was on the premises on August 8 when he was not scheduled to work, which was a rule violation.  As a result, on August 16, Carter received a written warning for attendance issues.

Carter responded that he had been on approved vacation on August 11 and 12 and filed a grievance.  Carter explained he came to the hotel on August 8 because he was not sure about the approval of his vacation days and came in to check the schedule.  Carter believed that his tardiness was not subject to discipline because he had called in more than three hours in advance. Although the record is not clear whether the hotel was persuaded by Carter's defenses, the hotel seems to admit that Carter was on approved vacation on August 11 and 12.  The hotel reduced the discipline to a verbal warning.

#### B.    The Dishwasher Incident

Between August 9 and August 13, a dishwasher was not working properly.  Kemph assigned another engineer to fix it.  That engineer examined the dishwasher but could not remedy the problem.  On August 15, 2010, Carter examined the dishwasher by running a cycle and watching the process for 15 minutes but he too could not determine the problem.  Carter informed Kemph that the hotel would need to hire an outside mechanic.  On August 18, after a

---

[5] References to Pl.'s LR 56.1 statement are found in Dkt No. 72.

second report, Carter examined the dishwasher again but was unable to make the repair.  On

August 19, Kemph e-mailed Carter stating that he was now aware that Carter was "not capable

of performing this repair or any other repair on this type of equipment" and apologized for

expecting Carter to perform this type of repair.  Pl. L.R. 56.1 ¶ 73.          A less experienced

engineer, Thomas McManus, ultimately fixed the dishwasher by tightening a loose screw.

Kemph subsequently asked Carter to provide him with a list of his skills so Kemph could assign

Carter tasks that better suited his strengths.  Carter responded to Kemph in an email stating,

"You can go to [Vasic] and ask for my resume if you want to see my experience."  Def. L.R.

56.1 ¶ 35.  On August 25, 2010, Vasic gave Carter a verbal warning for failing to make an

acceptable effort to address the fourth floor dishwasher.

### C.      The Locked-Out Guest Incident

On September 16, at approximately 6:45 to 6:50 a.m., the night manager radioed Eric

Johnson, an engineer, about a guest that had been locked out of his room.  Johnson, the only

engineer on duty, answered "one minute please," but did not follow-up with the night manager.

Pl. L.R. 56.1 ¶ 78.  Approximately five minutes later, the night manager radioed Johnson again.

Johnson responded that his shift was over so he was going home.  Johnson asked Carter, whose

shift started at 7:00 a.m., to respond to the call.  Neither Carter nor Johnson responded to the call

and the guest waited 25 minutes before being let into his room.  The hotel did not formally

discipline Carter or Johnson for their failure to respond to the call but placed notes in their

respective personnel files documenting the incident.

### D.      The Ice Machine Incident

On October 5, Carter was working on a broken ice machine and incorrectly concluded that the cause of the problem was a defective controller.  Carter and Kemph worked on the ice machine together but could not fix the problem.  The next day Kemph fixed the ice machine in approximately 30 minutes.  Carter acknowledged that he did not perform the repair correctly, and on October 14 the hotel issued Carter a written warning for failing to make an acceptable effort to complete the task.  Carter filed a grievance with his union.  Instead of signing the hotel's written warning, Carter wrote, "Again all lies to set me up for termination."  Def. L.R. 56.1 ¶ 54.

On October 21, the hotel held a grievance meeting with Vasic, Kemph, Carter, and a union representative.  During the meeting, Carter stated, "It's like working with a bunch of skinheads down there . . . like working with the Klan."  *Id*. ¶ 55.[6]

### E.      The Sink Incident

On October 27, a guest informed Carter that the hot water from the bathroom sink in his room was not flowing properly.  Carter determined that there was no hot water pressure and that the sink needed a major repair.  Although he had 90 minutes remaining on his shift, Carter informed the engineer on the next shift.  On October 29, another engineer fixed the faucet in approximately 15 minutes.  In connection with this incident, on November 4, the hotel issued Carter a final written warning.  On the signature line of the written warning, Carter wrote "Grievance requested.  More lies."  Def. L.R. 56.1 ¶ 63.

---

[6]  Carter's union representative was also present for the meeting and heard Carter's comment. The union representative clarified that Carter did not mean his "skinhead" comment to encompass everyone who worked at the hotel.  Rather, it was a reference to the engineers with whom Carter worked.

### F.     The Guest Room Lamp Incident

On November 11, the hotel assigned Carter to fix a broken lamp in a guest room. Carter determined that the problem was a broken post. Carter looked for but was unable to find a replacement post for the lamp. Carter radioed Kemph, who told him that he was currently busy with another project. Carter waited for approximately 30 minutes for Kemph to arrive and subsequently left the guest room to cover another job. Kemph had McManus check the lamp and McManus located a replacement post and fixed the lamp within five to ten minutes.

## IV.    Other Engineers' Work Performance and Attendance Issues

### A.     Eric Johnson

On October 1, 2009, Carter reported to Vasic that Johnson had placed a picture in the engineering room of Oprah Winfrey eating a watermelon hand-drawn in pink magic marker. Carter complained that the picture was racial harassment. Vasic discussed the incident with Johnson and told him that his behavior could be considered harassing or discriminatory. Vasic issued a note-to-file warning. Johnson refused to sign the note indicating that he believed the incident was "overblown." In September 2010, Kemph also notified Vasic that he was concerned that it took Johnson 45 minutes to locate a four-foot ladder, although Johnson was not disciplined. In October 2011, Johnson received a verbal warning for failure to clock out on three separate days.

### B.     John Dickinson

On July 28, John Dickinson, an engineer, placed his groin within two inches of Carter's face while Carter was tying his shoe. Dickinson commented to Carter, "While you are down there . . ." Pl. L.R. 56.1 ¶ 46. Carter responded by telling Dickinson that "if he didn't back up

off of me right now it would be a scene out of the movie Friday." Def. Resp. to Pl. L.R. 56.1 ¶ 46. Carter explained that the reference to the movie Friday was to a scene in the film where a man grabbed another man's genitals with a pair of pliers. *Id.* Dickinson responded by telling Carter that he "wouldn't live to tell about it." *Id.*

On July 29, Carter complained to Vasic about Dickinson and the next day Vasic issued Dickinson a written warning. That warning, however, inaccurately stated that Dickinson had told Carter that he "won't like to tell about it." Pl. L.R. 56.1 ¶ 47. In August and September 2010, Vasic investigated the July 28 incident between Dickinson and Carter. During her investigation, Vasic specifically asked Carter to identify what movie he was referring to and Carter responded,

"You can go watch it for yourself and find out." Def. L.R. 56.1 ¶ 43. Vasic testified that in August and September Carter made other comments that she considered disrespectful.[7] As a result, on October 5, 2010, Vasic issued Carter a verbal warning for his comments that she perceived to be disrespectful.

### C.    Thomas McManus

On September 11, McManus received a repair request call regarding a gas-fired steamer in the kitchen. McManus informed Kemph that he was unable to fix the problem after spending

---

[7]  Vasic specifically testified that Carter was disrespectful and insubordinate when she met with him. Vasic testified,

> Every time I would ask him a question I got constant attitude. He would fight me on every little thing I would say, he would cut me off on a regular basis. So, I would start to ask something or start to say something and I would be cut off multiple times. Just, again, lack of disrespect or lack of respect, rather, and a very poor demeanor and insubordination.

Def. L.R. 56.1, Ex. G, Vasic Dep. 61.

half-hour trying to do so. Kemph instructed McManus to research the issue online. The next day, Carter repaired the steamer in approximately three to five minutes. Kemph testified that he did not discipline McManus for failing to fix the steamer because he put forth effort by researching the issue online and looking for a manual at the hotel.

## V.      Carter's Termination

On October 27, the hotel gave Carter a non-disciplinary letter informing Carter that his work performance needed to improve and offering to help with that process. The letter also stated that it was "not too late to turn things around." Def. L.R. 56.1 ¶ 75. The letter was in response to the various disciplinary actions that the hotel had taken against Carter. On November 11, after Carter failed to replace a guest room lamp, the hotel determined that Carter was not performing his job satisfactorily and, on November 12, it terminated Carter's employment stating, "Your performance over the last few months has deteriorated substantially. We have warned you repeatedly that your performance is unsatisfactory. Such unsatisfactory job performance can no longer be tolerated." Def. L.R. 56.1, Ex. B, Carter Dep. Ex.26.

On December 20, Carter filed a second charge with the EEOC alleging discrimination and retaliation.

## ANALYSIS

## I.      Motion to Strike

### A.      Carter's Response to the Hotel's Statement of Material Facts

The hotel contends that Carter's responses to paragraphs 23, 24, 32, 36, 38, 40, 41, 42, 49, 52, 53, 59, 60, 62, 73, and 76 of its statement of material facts contain denials that improperly cite to Carter's statement of additional facts as support. Local Rule 56.1 provides

that the nonmovant's response to a statement of material facts "in the case of any disagreement [must include] specific references to the affidavits, parts of the record, and other supporting material relied upon." N.D. Ill. L.R. 56.1(b)(3)(B). Under the rule, a nonmovant may not support his denials solely with cross-references to his own statement of additional facts. *See Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 735 F. Supp. 2d 856, 864 (N.D. Ill. 2010) ("Plaintiffs, rather than providing a cite to the record in order to dispute a particular fact, instead cite to paragraphs contained in their statement of additional facts. This is contrary to both the letter and spirit of Local Rule 56.1."). The hotel's motion to strike Carter's improper responses to its statement of material facts is granted. These facts will be deemed admitted.

### B.    Carter's Statement of Additional Facts

Carter initially included 115 paragraphs in his Rule 56.1(b)(3) statement of additional facts. The court instructed Carter to include only facts in support of his Local Rule 56.1(b)(3) response that supported his discrimination and retaliation claims and allowed him to file 80 additional facts, which was twice the number of additional facts allowed under Local Rule 56.1(b)(3)(C). *See* Dkts. 54, 57; Local Rule 56.1(b)(3)(C) ("Absent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-numbered statements of additional facts."); Local Rule 56.1 Committee Comment ("A party may seek leave to file more asserted statements of fact or additional fact, upon a showing that the complexity of the case requires a relaxation of the 80 or 40 statement limit."). Carter filed an amended statement of additional facts. His amended statement, however, mainly reconfigured his original 115 paragraphs into 77 paragraphs. As a result, the court ruled that paragraphs exceeding three sentences would be treated as a single paragraph and that the hotel was only required to respond

10

to the first 80 paragraphs counted in this manner.  Dkt. 66.  The court further ruled that additional paragraphs would be disregarded in ruling on the motion for summary judgment.  *Id*.

In his response to the hotel's motion for summary judgment, Carter relies on paragraphs contained in his Local Rule 56.1(b)(3) statements of additional facts outside of the court's 80-paragraph limit.  Courts require strict compliance with Local Rule 56.1.  *See Cracco* v. *Vitran Exp. Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("'Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules.'") (quoting *FTC* v. *Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005)); *see also Greer* v. *Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001) ("Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.") (internal quotation marks omitted).  Thus, to the extent that Carter relies on paragraphs outside the parameters of the court's ruling, they are disregarded.

## II.  Race Discrimination (Count I)

Carter alleges that the hotel discriminated against him based on race in violation of Title VII and 42 U.S.C. § 1981 by subjecting him to discriminatory discipline and terminating his employment.[8]  Carter proceeds under the familiar indirect method of proof set out in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Under this approach, to demonstrate a *prima facie* case of discrimination Carter must show that (1) he is a

---

[8]  The method of proving discrimination under Title VII and § 1981 is "essentially identical" and thus the same analysis applies to both statutes.  *See McGowan* v. *Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).

member of a protected class; (2) he was meeting the hotel's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Naficy* v. *Ill. Dep't. of Human Servs.*, 697 F.3d 504, 511 (7th Cir. 2012). If Carter establishes a *prima facie* case, the hotel must present evidence showing a legitimate, nondiscriminatory reason for the employment action. *Id*. Carter must then present evidence showing that the hotel's stated reason is pretextual. *Id*. at 511–12.

### A.      Whether Carter Was Meeting the Hotel's Legitimate Expectations

Carter satisfies the first element of a *prima facie* case because he is African-American. Carter must next show that he was meeting the hotel's legitimate expectations at the time of the discriminatory acts. *See Naik* v. *Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010). The hotel argues that Carter was not meeting its legitimate expectations evidenced by the numerous instances between August and November where Carter had attendance issues, failed to perform repairs, and was insubordinate. Carter contends that the hotel's decisions to impose discipline in those instances were illegitimate and unwarranted. Although the Seventh Circuit has cautioned that district courts need not reach the pretextual analysis without first determining whether a plaintiff can make out a *prima facie* case, where "an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its challenged conduct." *Duncan* v. *Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008); *see also Keeton* v. *Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012). Accordingly, whether Carter was meeting the hotel's employment expectations will be discussed the pretext analysis below (Part II.C).

## B. Whether Carter Can Identify Similarly Situated Employees Treated More Favorably

To make the *prima facie* showing, Carter must identify similarly situated employees outside of his protected class who were treated more favorably than he.[9] The similarly situated employee inquiry, which calls for a "flexible, common sense" approach, asks whether there are "enough common features between the individuals to allow [for] a meaningful comparison." *Argyropoulos* v. *City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008). While "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations," *Naik*, 627 F.3d at 600 (internal quotation marks omitted), they need not be "identical in every conceivable way." *Coleman* v. *Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). In order to show that an employee was similarly situated, Carter must demonstrate that he or she "(1) dealt with the same supervisor, (2) [was] subject to the same standards, and (3) engaged in similar conduct without such

---

[9] Carter insinuates that, in addition to his termination, the hotel's disciplinary decisions were actionable "adverse actions." Adverse actions are defined "quite broadly" but such actions must be more than a "mere inconvenience or an alteration of job responsibilities." *Oest* v. *Ill. Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001) (internal quotation marks omitted). Rather, to be adverse in Title VII terms, the action must materially alter the employee's situation, such as by termination, demotion, diminished pay, benefits, or title. *See id.* Negative performance evaluations and written or oral reprimands alone are normally not adverse actions. *See id.* (citing example cases). Carter points to no evidence showing that the written and verbal warnings and the note to file had tangible consequences on his employment such as a decrease in salary, loss of benefits, or a demotion. *See Oest*, 240 F.3d at 613 ("[The plaintiff] has not pointed to any immediate consequences of the reprimands, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities."); *Whittaker* v. *N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) ("[W]hile one might argue that 'each oral or written reprimand brought [the plaintiff] closer to termination[,], [s]uch a course was not an inevitable consequence of every reprimand ...; [rather,] job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship.'") (quoting *Oest*, 240 F.3d at 613). Accordingly, the pre-termination discipline incidents were not adverse actions. They are, of course, relevant evidence in determining whether the hotel's decision to terminate his employment was discriminatory.

differentiating or mitigating circumstances as would distinguish [his or her] conduct or the employer's treatment of [him or her]." *Id*. at 847 (internal quotation marks omitted).

### i)       Same Supervisor

"The similarly-situated requirement 'normally entails' the existence of a common supervisor," *Coleman*, 667 F.3d at 848, as the question is "whether they were treated more favorably by the same decisionmaker." *Id*. (citation, internal quotation marks, and emphasis omitted). Carter identifies Eric Johnson, John Dickinson, and Thomas McManus, all white, as co-engineers who engaged in similar misconduct but received preferential treatment.[10] Carter and his co-engineers all reported to Kemph. Kemph, Vasic, and Carsch had the authority to discipline Carter and his co-engineers and ultimately made the decision to terminate Carter's employment, thus making them decisionmakers. Accordingly, Carter and his co-engineers shared common decisionmakers.

### ii)      Same Standards

Carter must next show that he and his proposed comparators were subject to the same standards. Carter, Johnson, Dickinson, and McManus were all engineers at the hotel and were subject to the hotel's employee handbook, which the hotel provided to its employees. Kemph also provided the engineers with a job description, a guide on proper guest room procedures, a guide on preventative maintenance procedures, and a guide on lunch period relief for the house

---

[10]    Carter also relies on a logbook attached as an exhibit to his response showing that he was consistently able to troubleshoot repairs that other engineers were unable to accomplish. The logbook, however, is hearsay under Federal Rule of Evidence 801. Although it might have been an admissible under Rule 803(6), Carter failed to provide any witness who could establish a foundation for the document or testify about its contents. Accordingly, the court will not consider the logbook.

call engineer. Because they were all engineers at the hotel, Carter, Johnson, Dickinson, and McManus were subject to the same standards.

### iii) Conduct of Comparable Seriousness

When analyzing this final prong of the similarly situated employee test, courts look to whether co-workers "'engaged in comparable rule or policy violations' and received more lenient discipline." *Coleman*, 667 F.3d at 850 (internal quotation marks omitted). "[T]he critical question is whether [the employees] have engaged in conduct of comparable seriousness.'" *Id.* at 851 (internal quotation marks omitted).

During August through October, the hotel issued Carter six warnings related to his job performance. It issued two additional warnings for behavior. He was given a final warning after the October 27 incident and fired approximately two weeks later after another perceived performance deficiency. By comparison, Johnson had one performance incident and one behavior incident over the course of a year. Had Johnson been disciplined for the ladder-finding incident (which the hotel disputes), he would have had two performance disciplines. Johnson and Carter were involved in one incident together and received the same discipline.

Turning to Dickinson, Carter contends that Dickinson received a slap on the wrist for making an obscene proposition and subsequently threatening Carter's life. In connection with this incident, Vasic issued Dickinson a written warning.[11] Dickinson had no discipline for failure to accomplish assigned duties.

---

[11] The hotel did not discipline Carter for his role in this incident. Vasic, however, later disciplined Carter for making disrespectful comments to her during her investigation of the incident.

Last, Carter argues that McManus failed to perform repairs at the hotel but he was not disciplined nor was he terminated. Carter notes that on September 11, McManus failed to fix a gas-fired steamer that Carter was able to fix the next day in approximately three to five minutes. Additionally, McManus was also unable to fix the seventh floor ice machine. There is no evidence that McManus was insubordinate.[12]

Plainly, the number of performance-related warnings issued to Carter exceeded each of the engineers with whom he compares himself. Moreover, the warnings to Carter occurred within a three-month period, whereas with Johnson one incident occurred in October 2009 and the next approximately a year later. Only where Carter was disciplined for failure to troubleshoot the ice machine problem but McManus was not could it possibly be inferred that a white engineer received more favorable treatment than Carter. Other than this incident, the record reflects that white engineers received comparable discipline for infractions as did Carter. Certainly, Carter had significantly more disciplinary actions than his comparators. The sole disparity as to one incident is hardly sufficient to raise a material issue of fact as to whether Carter was terminated under circumstances where, had he been white, he would not have been terminated.

---

[12] Carter additionally argues that Hermann, the former chief engineer, is a comparator, relying on evidence in support of his now-abandoned hostile work environment claim. Namely, Carter argues that Hermann (1) made a disparaging racial comment about Carter when Hermann stated "who turned off the lights" while he was fixing a light and (2) failed to reprimand an outside contractor who used the term "nigger" in front of Hermann. Carter complained to Vasic, who cautioned Hermann to be more aware of his comments. Hermann may be useful to compare how the two were treated as to incidents of verbal abuse (e.g., the skinhead/Klan remark *v.* the N-word remark), but there is no evidence concerning performance issues that Hermann failed to perform assigned work or was insubordinate but not disciplined or disciplined less harshly than Carter.

### III. Whether Carter Can Establish Pretext

But even giving Carter the benefit of the doubt on the disparate treatment issue, Carter must still demonstrate that the hotel's reason for his termination was pretextual. To show pretext, Carter must demonstrate that "'(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent.'" *Perez* v. *Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quoting *E.E.O.C.* v. *Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006)). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise* v. *Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (brackets omitted)). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *See Duncan*, 518 F.3d at 492.

The hotel argues that it terminated Carter's employment because of his work performance and attitude.[13] In arguing pretext, Carter does not deny that the performance incidents occurred substantially as alleged but focuses on what he believes are sound reasons for

---

[13] Carter also references the following instances as evidence of discrimination: (1) Carter's former supervisor, Hermann, walked by him and stated, "Who turned out the lights?" while Carter was changing a light; (2) Hermann treated Caucasian employees more favorably; (3) Hermann did not say anything after a contractor used the term "nigger" in front of them both; and (4) Carter received a Kwanzaa card at work stating "Hey Buckwheat . . . . ya mutt . . . Happy Kwanzaa XOXO James Earl Ray." The aforementioned evidence, while possibly relevant to Carter's abandoned hostile work environment claim, does not implicate the decisionmakers (*i.e.*, Vasic, Kemph, or Carsch) who terminated his employment and thus is not relevant to his discrimination claim. *See e.g.*, *Davis* v. *Con-Way Transp. Cent. Exp., Inc.*, 368 F.3d 776, 786 (7th Cir. 2004) (the plaintiff failed to show that the decisionmakers acted pretextually by lying about their reasons for terminating the plaintiff's employment).

his non-performance or why someone else was more to blame. Carter also asserts that the hotel never communicated its rules or expectations to him.

First, concerning the attendance discipline, the hotel incorrectly imposed discipline for two absences which were in fact approved vacation days. It later reduced the discipline, however, which indicates that the hotel accepted that it had made a mistake in that respect, but it adhered to its position that the other absences were worthy of discipline. Thus, one cannot infer that the hotel made an intentionally false accusation or that its stated reason is unworthy of credence. Although it may not have been fair to Carter, it is well established that the court does not sit as a superpersonnel department where disappointed employees "can have the merits of an employer's decision replayed to determine best business practices." *Blise*, 409 F.3d at 867 (citing cases).

Second, Carter argues that imposing discipline for his failure to repair the dishwasher in August is indicative of pretext. Although Carter contends that he was not qualified to make the repair and that Kemph later acknowledged that making the repair was outside of Carter's realm of expertise, it remains a fact that in the employer's judgment Carter did not make a reasonable effort. Moreover, after failing to make the repair, Kemph asked Carter to provide him with a list of what he could do. Rather than cooperate with Kemph, Carter told him ask Vasic to look at his resume. Indeed, Carter's insubordination after failing to make the repair lends further support for the hotel's stated reason to discipline and ultimately terminate him. There is no evidence that the stated reason was not the true reason for the discipline.

Third, Carter argues that the discipline he received for failing to fix the ice machine is indicative of pretext. Carter contends that he lacked the expertise to perform the required repair

18

and that Kemph disregarded this fact. Carter's personal view that he was unqualified to perform these repairs does not create a question of fact regarding whether he was satisfactorily performing his job. *Cf. Stockwell* v. *City of Harvey*, 597 F.3d 895, 904 n.4 (7th Cir. 2010) ("[A]n employee's perception of his own performance . . . cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities.") (quoting *Millbrook* v. *IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (ellipsis in original; quotation marks and citation omitted)). Furthermore, similar to the issue with the dishwasher, Carter's behavior after the incident evidenced insubordination. Instead of signing the written warning, Carter wrote, "Again all lies to set me up for termination." Def. L.R. 56.1 ¶ 54. Carter's personal disagreement for the reason substantiating the hotel's decision to discipline him cannot provide the basis for pretext. *See Brown* v. *Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) ("Perhaps their supervisors' criticisms were unfair—clearly the plaintiffs feel that they were—but there is no evidence that they were unfair *because they were motivated by race*, as Title VII forbids.") (emphasis in original). Nor does Carter's personal opinion that he was being set up for termination rebut the evidence of non-performance of an assigned task.

Fourth, Carter challenges the hotel's decision to discipline him for failing to respond to a guest locked out of his room, to repair a guest room sink, and to replace a guest room lamp. In sum, there is no dispute of fact that these duties were within Carter's area of responsibility as an engineer and that the jobs were not completed as expected.

19

Fifth, Carter argues that the hotel never conveyed its employment expectations to him, thus making its decision to discipline him unreasonable. Carter, however, had ample notice of its employment policies and expectations. The hotel provided all employees with a handbook detailing the hotel's policies and rules. Kemph provided engineers with a job description and several procedural guides. Moreover, each of the disciplinary warnings set out an Action Plan describing expectations and what Carter needed to do to improve his performance in the future. *See*, *e.g.*, Def. L.R. 56.1, Ex. B, Carter Dep. Ex. 20. Carter asserts that neither Vasic nor Kemph attempted to speak with him to learn his side of the story. This may show lack of sensitivity but does not change the fact that the employer, not the employee, sets the rules and expectations, which were certainly conveyed to Carter. Vasic and Kemph spoke with Carter on numerous occasions but Carter was uncooperative. After receiving written warnings issued in connection with the ice machine and guest room sink, instead of signing the warnings Carter wrote "lies" on the documents. Moreover, shortly before Carter was terminated, on October 27, the hotel issued him a non-disciplinary letter identifying his performance issues and also stating that it was "not too late to turn things around." Def. L.R. 56.1 ¶ 75. This evidence undercuts Carter's position that the hotel did not communicate with him.[14]

---

[14] Rather than being uncommunicative about the situation, Vasic appeared to plead with Carter to respond positively to the feedback she was giving him. On October 14, she wrote,

> . . . It is very troublesome to us that the exact same problem has now happened twice in a very short period of time. It almost appears as though your subpar work performance is deliberate. We truly hope that is not the case. It is our sincere hope that you will change your pattern of conduct and become the satisfactory employee we know you can be. If there is anything we can do to assist you, we hope you will ask. But you should know that you are moving perilously close to losing your job . . . .

Def. L.R. 56.1 ¶ 53.

Last, Carter argues that Vasic's credibility is at issue precluding summary judgment. He contends that Vasic (1) neglected to disclose instances of discrimination to the EEOC during the investigation into Carter's April 23, 2010 complaint; (2) destroyed her handwritten notes of interviews she had with Carter where he alleged discrimination; and (3) did not take accurate notes of his confrontation with Dickinson. Carter first argues that Vasic failed to inform the EEOC in a letter about (1) the use of the word "nigger" by a contractor and the hotel's failure to take any action; (2) the Oprah Winfrey picture; (3) the Kwanzaa card; and (4) Carter's complaint that Caucasian engineers received better treatment. Vasic testified that she sent the EEOC an additional statement of position, which she believed responded to Carter's EEOC charge. Although Carter argues that Vasic failed to preserve handwritten notes of her interviews with Carter, Vasic typed those notes and testified that her typed notes were just as detailed as her handwritten notes. Last, Carter contends that Vasic's note regarding Dickinson's threat to Carter stated that "you won't like to tell about it" when Dickinson actually told Carter that "you won't live to tell about it." Vasic investigated the incident between Dickinson and Carter and disciplined Dickinson. The hotel does not dispute that Dickinson used the word "live" instead of "like." In sum, these references do not call Vasic's credibility into question.

In short, Carter has failed to carry his burden of demonstrating that he was meeting the hotel's legitimate expectations. Nor does he present sufficient evidence of pretext to call the honesty of the hotel's reasons for termination into question. Accordingly, the hotel's motion for summary judgment with respect to count I is granted. *See Everroad*, 604 F.3d at 478 n. 2 ("[T]he decisive question is whether [the employer] genuinely believed that [the employee] had been insubordinate."); *Biolchini* v. *Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999) ("[T]his

21

court has noted that even where a plaintiff in a discrimination case alleges that the company's investigation was imprudent, ill-informed and inaccurate, summary judgment is appropriate unless the employee could point to facts suggesting that the company investigated [him] differently because [of race].").

### III.    Retaliation (Count II)

Carter claims that the hotel retaliated against him in violation Title VII and § 1981 by disciplining him for poor performance after he internally complained and filed a complaint with the EEOC on April 23, 2010.[15]   Carter again proceeds under the indirect burden-shifting model. Carter argues that the hotel retaliated against him for making internal complaints regarding discrimination in the fall or 2009 and for filing a complaint with the EEOC on April 23, 2010 alleging discrimination and retaliation.  Carter's retaliation claim fails for the same reasons as his discrimination claim.  Carter cannot establish that he was meeting the hotel's legitimate employment expectations nor does he offer sufficient evidence of pretext.  In addition, Carter failed to establish that similarly situated employees who did not file complaints with the EEOC were treated more favorably.  Carter thus cannot satisfy the indirect burden shifting test and his retaliation claim thus fails as a matter of law.  Accordingly, the hotel's motion for summary judgment is granted with respect to count II.

---

[15]    The elements of proof for retaliation claims under Title VII and § 1981 are "essentially identical" and are analyzed together.  *Brown*, 700 F.3d at 1104 n.1.

**ORDER**

The defendant's motion for summary judgment is granted.  This case is terminated.


Dated: May 3, 2013                                      Enter: _____

                                                        JOAN HUMPHREY LEFKOW
                                                        United States District Judge